439 So.2d 377 (1983)
STATE of Louisiana
v.
UNION TANK CAR COMPANY.
No. 82-WA-1008.
Supreme Court of Louisiana.
March 25, 1983.
*379 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie Brown, Dist. Atty., Kay Kirkpatrick, Warren J. Hebert, Aubrey Ward, Asst. Dist. Attys., for plaintiff-appellant.
Frank S. Craig, III, Frank J. Gremillion, Baton Rouge, for defendant-appellee.
BLANCHE, Justice.
Union Tank Car Company is a corporation engaged in the sale, lease and repair of tank cars. In the spring of 1981, a tank car was sent to the Union Tank Car facilities in East Baton Rouge Parish for repairs and cleaning. While Union Tank Car personnel were steam-cleaning the car, the steam interacted with residual chemicals in the interior of the car, causing an extremely offensive smell to escape into the atmosphere.
As a result of this activity, Union Tank Car was charged by grand jury indictment with violation of the Louisiana Environmental Affairs Act in that it "willfully and knowingly discharged, emitted and disposed of an air contaminant in violation of Sections 4.4, 4.23, 4.74, 17.10, 17.11, and 8.2 of the Air Quality Regulations." Union Tank Car filed a motion to quash the indictment on two grounds. First, Union Tank Car alleged that Part III of the Environmental Affairs Act, the Louisiana Air Control Law, represents an unconstitutional delegation of the legislature's crime defining authority to an administrative agency (the Environmental Control Commission), as a violation of any regulation adopted by the Commission may result in criminal sanctions under La. R.S. 30:1073(F). Secondly, Union Tank Car alleged that the statutes and regulations of the Louisiana Air Control Law are unconstitutionally vague.
Following a hearing on the motion, the trial judge quashed the indictment against Union Tank Car Company. In doing so, the judge ruled that the Louisiana Air Control Law represents an unconstitutional delegation of legislative authority and that the statutes and regulations of the Air Control Law are unconstitutionally vague. The State has appealed this ruling under Article V, § 5 of the Louisiana Constitution of 1974, which provides that a case shall be appealable to this court if a law or ordinance has been declared unconstitutional.
Union Tank Car Company is charged in this case with the release of an extremely offensive smell in violation of the Louisiana Environmental Affairs Act.[1] La.R.S. 30:1085 and 1087 are the applicable prohibitory sections of Part III of that act, the Louisiana Air Control Law. La.R.S. 30:1085 provides that "[n]o person shall conduct any activity which results in the discharge of air contaminants without the appropriate permit or license as required under the regulations of the commission adopted pursuant to this Part." La.R.S. 30:1087 also states that "[n]o person shall: (A) Discharge air contaminants into the air of this state in violation of the regulations of the commission or the terms of any permit, license, or variance issued hereunder. (B) Violate any rule or regulation adopted by the Commission under this Part." As part of the general enforcement scheme for the entire Environmental Affairs Act, La. R.S. 30:1073(F)(2) provides that "[a]ny person who willfully or knowingly discharges, emits, or disposes of any substance in contravention *380 of any provision of this Chapter, of the regulations, or of the permit or license terms and conditions in pursuance thereof, when the substance does not endanger or could not endanger human life or health, shall be guilty of a misdemeanor and shall be fined not more than twenty five thousand dollars per day of violation and costs of prosecution, or imprisoned for not more than one year, or both."
Through the above-quoted statutes, the legislature has made discharging air contaminants into the atmosphere a crime, punishable by the penalties prescribed under La.R.S. 30:1073(F). The question which is presented for our resolution is whether, consistent with constitutional principles, these statutes can form the basis of a criminal prosecution.

I.
Union Tank Car Company first contends that the Louisiana Air Control Law is unconstitutional because it delegates legislative power to the Environmental Control Commission without specifying sufficient standards or guidelines within which the Commission may act.
La.R.S. 30:1084(B) provides:
The commission shall have the following powers and duties:
(1) To adopt and promulgate rules and regulations consistent with applicable state and federal law, and the general intent and purposes of this Part for the maintenance of air quality within the state of Louisiana.
It is a well-established rule of constitutional jurisprudence that although the legislature may not delegate purely legislative power, it may declare its will, and, after fixing a primary standard, devolve upon administrative officers the power to "fill up the details" by prescribing administrative rules and regulations. United States v. Shreveport Grain and Elevator Co., 287 U.S. 77, 53 S.Ct. 42, 77 L.Ed. 175 (1932). In other words, although the legislature may not delegate the legislative power to determine what the law shall be, it may delegate to administrative boards and agencies of the state the power to ascertain and determine the facts upon which the laws are to be applied and enforced. State v. Rodriguez, 379 So.2d 1084 (La.1980); State v. Guidry, 142 La. 422, 76 So. 843 (La.1917). As explained by this court in the case of Schwegmann Brothers Giant Super Markets v. McCrory, Commissioner of Agriculture, 237 La. 768, 112 So.2d 606, 613 (La.1959):
So long as the regulation or action of the official or board authorized by statute does not in effect determine what the law shall be, or involve the exercise of primary and independent discretion, but only determines within prescribed limits some fact upon which the law by its own terms operates, such regulation is administrative and not legislative in its nature.
Consistent with this principle, Louisiana courts have upheld the constitutionality of statutes delegating broad powers to administrative officers to determine the details of a legislative scheme where those statutes express a clear legislative policy, and contain sufficient standards for the guidance of the administrative official empowered to execute the law.[2] Of course, the standards which must accompany such a grant of power must not be unlimited, unreasonable, or permit arbitrary action by the administrative body. This requirement is implicit in the general rule prohibiting the delegation of legislative power, and is affirmed in numerous cases decided by this court. State v. Rodriguez, 379 So.2d 1084 (La.1980); State v. Morgan, 238 La. 829, 116 So.2d 682 (La.1960); National Bank of Commerce v. Louisiana State University, 206 La. 913, 20 So.2d 264 (1944); City of Baton Rouge v. Shilg, 198 La. 994, 5 So.2d 312 (1941).
*381 As announced by this court in the case of State v. Broom, 439 So.2d 357 (La.1983), authored by Justice Calogero and handed down this date, the determination of whether the delegation of legislative authority to an administrative agency adequately protects against the exercise of arbitrary power by the administrative body and therefore effects a constitutional delegation of legislative authority involves a two prong inquiry. Not only must we consider the sufficiency of the standards which accompany such a delegation, but we must also look for the presence of adequate procedural safeguards to protect against an abuse of discretion by those to whom the power is delegated.
Accordingly, the determination of whether the Louisiana Air Control Law effects a constitutional delegation of legislative power depends upon whether that statute contains a clear expression of legislative policy coupled with sufficient standards to guide in the execution of that policy, and is accompanied by adequate procedural safeguards to protect against abuse of discretion by the Environmental Control Commission.
The policy provision of the Louisiana Air Control law is found at La.R.S. 30:1082. That statute provides:
The legislature finds and declares that the purity of the air in the environment is a matter of vital concern to the welfare of the people of the state and to promote an environment free from pollution that jeopardizes the health and welfare of the citizens of the state, consistent with sound policies for employment and industrial development, it is necessary to establish an efficient method for the regulation and control of discharge of contaminants.
The policy provision of the Louisiana Air Control Law is quite clear in its intention. Its goal is to promote an environment free from pollution that jeopardizes the health and welfare of the citizens of the state. We consider this to be a reasonable governmental policy established in the interest of public health, safety, and welfare. We are furthermore of the opinion that this statement of purpose and intent establishes a definite policy of the State which permits an administrative body to make rules and regulations necessary for the administration and enforcement of that policy.
The policy provision in this case is analogous to that challenged and upheld in Johnson v. Pearce, 313 So.2d 812 (La.1975), a case in which the legislature had delegated authority to the Livestock Sanitary Board to promulgate rules and regulations necessary to combat the spread of brucellosis among cattle. In Johnson, we held that the control and eradication of a disease among animals was a proper legislative goal. We also noted that "[o]nce the legislature has defined its policy ... the State, acting under its police power to protect the health, welfare and safety of the people, may confer upon administrative officers or bodies the power to adopt the rules and regulations to effectuate the legislative will." Johnson v. Pearce, supra at p. 819.
Under the Johnson rationale, the policy declaration of the Louisiana Air Control Law found at La.R.S. 30:1082 can be sustained as a valid exercise of the State's police power to protect the public health. As such, it is clearly adequate to support a delegation of legislative authority.
Since the legislature has sufficiently enumerated its intent with respect to air pollution control in La.R.S. 30:1082, we must now determine whether the standards accompanying this declaration of legislative intent give adequate guidelines to the Environmental Control Commission in promulgating the necessary regulations for the control of air quality. In testing the constitutional sufficiency of the standards prescribed in the Air Control Law, regard must be given to the purpose and scope of the act, the subject matters covered therein, the duties prescribed, and the broad or narrow powers granted. Bortz Coal Co. v. Air Pollution Commission, 2 Pa.Cmwlth. 441, 279 A.2d 388 (Pa.1971).
In this connection, we must remember that an act of the legislature is *382 presumed to be legal until it is shown to be unconstitutional, and that in construing statutes courts must endeavor to give an interpretation that will give them effectiveness and purpose, rather than one which makes them meaningless. Johnson v. Sewerage Dist. No. 2 of Caddo Parish, 239 La. 840, 120 So.2d 262 (La.1960); Lachney v. Motor Parts & Bearing Supply, Inc., 357 So.2d 1277 (La.App. 3rd Cir.1978).
We must also take cognizance of the fact that the judicial approval accorded to the practice of conferring ministerial powers upon administrative agencies is a product of the complex economic and social problems modern legislation must address. As noted by the U.S. Supreme Court in the case of American Power and Light Co. v. S.E.C., 329 U.S. 90, 105, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946):
The legislative process would frequently bog down if Congress were constitutionally required to appraise beforehand the myriad situations to which it wishes a particular policy to be applied and to formulate specific rules for each situation. Necessity therefore fixes a point beyond which it is unreasonable and impracticable to compel Congress to prescribe detailed rules ...
This is especially true in a field as complex and diverse as that of environmental law. The area is in its infancy, is yet inexact, and consequently is progressively changing. Other states have taken note of the unusual nature of environmental law in considering the constitutionality of statutory prohibitions in this area. As explained by the Illinois appellate court in the case of Southern Illinois Asphalt Co., Inc. v. Environmental Protection Agency, 15 Ill.App.3d 66, 303 N.E.2d 606, 611 (Ill.1973):
[We] are involved with air pollution control, a subject which is fairly new to the law and yet more and more important to the public welfare. By its very nature it defies the establishment of precise standards. It involves a highly specialized science, and yet covers an exceedingly broad spectrum. It is complex and not reducible to easy equations, particularly in view of our constantly growing knowledge and understanding of our environment and its effect upon our lives and our very existence.
Because statutes directed at the control of air pollution are intended to encompass infinitely variable environmental conditions, flexibility and adaptability are required in meeting factual situations which could not possibly be foreseen by the legislature. State v. Braun, 378 A.2d 640 (Del.1977). Thus, we are satisfied that statutes in the area of environmental law need not address each and every factual situation in which air pollution might be involved. Instead it is sufficient if the statutes be general in nature but at the same time retain standards of sufficient clarity to put a violator on notice.
Turning to an examination of the provisions of the Louisiana Air Control Law, we conclude that the standards prescribed in that law, although broad, are nevertheless adequate to support a constitutional delegation of authority.
La.R.S. 30:1085 and 1087 direct that the discharge of air contaminants into the air of this state is illegal except where permits, licenses or variances are applicable. La. R.S. 30:1054(12) defines what is meant by a "discharge,"[3] while La.R.S. 30:1083(1) defines the term "air contaminants."[4] La. R.S. 30:1083(2) then goes on to address what is intended to be the focus of the *383 statutory prohibitions: the emission of "undesirable levels" of air contaminants.
While it is true that La.R.S. 30:1085 and 1087 proscribe the discharge of all contaminants, it is apparent from looking to the Air Control Act as a whole that the aim of the legislation is the prevention of emissions of "undesirable levels" of contaminants. It is well-settled that the standards which must accompany a delegation of legislative authority need not necessarily be set forth in express terms if they might reasonably be inferred from the statutory scheme as a whole. State v. Arizona Mines Supply Co., 107 Ariz. 199, 484 P.2d 619 (Ariz.1971); and that courts will not impute meanings which will lead to absurd results or extend statutes to situations which the legislature never intended should be covered thereby. Smith v. Town of Vinton, 209 La. 587, 25 So.2d 237 (La.1946). Thus, the failure of the legislature to use the phrase "undesirable level" in 30:1085 and 1087 does not defeat the statutory scheme, especially where it is clear from the Air Control Act itself that the legislature did not intend to proscribe the discharge of all air contaminants, however insignificant in quantity, but only those contaminants which reach "undesirable levels."
Under La.R.S. 30:1083(2), an "undesirable level" of air contaminants is the presence in the atmosphere of such quantities and concentrations of contaminants as to appreciably injure human life beyond inconvenience, or as to materially injure or interfere with reasonable use of animal or plant life or property. Clearly, these definitions give ample indications of the various factors to be considered by the Environmental Control Commission in promulgating its regulations and in issuing permits, licenses, and variances in accordance with the authority granted the Environmental Control Commission in La.R.S. 30:1084.
In summary, it is evident that through the statutes of the Air Control Law, the legislature has devised a scheme which provides intelligible standards sufficient to guide the Environmental Control Commission in its enforcement of the legislative will. The goal of the legislation is the protection of the public health and welfare. R.S. 30:1082. The method of enforcement is the prohibition of the discharge of air contaminants except where permits licenses, or variances are applicable. R.S. 30:1085 and 1087. The primary focus of the prohibition is aimed at preventing discharges which reach "undesirable levels." R.S. 30:1083(2). Clearly, the Air Control Law provides sufficient guidelines and standards to prevent arbitrary action by the administrative agency.[5]
In addition to these explicit statutory standards, the legislature has incorporated the full panoply of procedural safeguards invoked by the Administrative Procedure Act, La.R.S. 49:951-970, into the Louisiana Environmental Affairs Act, thereby insuring ample protection against arbitrary action by the Environmental Control Commission in adopting the regulations. La.R.S. 30:1066; State v. Broom, 439 So.2d 357 (La.1983).
Therefore, considering the expressed policy and standards along with the enacted procedural safeguards, we conclude that the Air Control Law does not involve an unconstitutional *384 delegation of legislative authority.

II.
Union Tank Car Company further contends that the regulations it is charged with violating are vague, uncertain, and indefinite, and therefore, unconstitutional. The indictment charges Union Tank Car Company with violating LAC 14-11:4.4, 4.23, 4.74, 17.10, 17.11 and 8.2. Of these regulations, only LAC 14-11:17.10, 17.11 and 8.2 contain prohibitory language.
LAC 14-11:8.2 and 17.10 are virtually identical and read as follows:
No person or persons owning, leasing, renting or controlling the operation of any source of air contaminants shall cause, suffer, allow, or permit emissions from this source of air contaminants which will result in "undesirable levels" as defined in Section 4.74 herein in the atmosphere over properties other than that of the person owning, leasing, renting or controlling the operation of such source.
LAC 14-11:4.74 defines the term "undesirable levels" in language which substantially tracks that of La.R.S. 30:1083(2). It provides:
Undesirable levels of the items defined in Section 4.4 hereof is the presence in the atmosphere, as limited by R.S. 40:2204(C), of one or more of such items or combinations thereof in quantities and concentrations and of such characteristics, properties, and duration as to appreciably injure human life beyond inconvenience or in quantities and concentrations and of such characteristics, properties, and duration as to materially injure or interfere with the reasonable use of animal or plant life or property. In determining whether contaminants create undesirable levels the Department may use appropriate information and data which may include but not be limited by acceptable national standards, published "safe limit" values and other such information and relationships which may provide a reasonable assessment of the conditions which exist for a particular situation.
The third prohibitory regulation involved is LAC 14-11:17.11. It requires:
Pursuant to 6.1 the Department must be notified promptly of emergency occurrences or upsets that will substantially increase emissions. Immediate telephone notification should be followed promptly by written notification, within 7 calendar days, giving details of the occurrence and remedial actions. Timely and appropriate follow-up reports should be made detailing the methods or procedures to be used to prevent similar atmospheric releases. Such notification does not imply the Technical Secretary will automatically grant an exemption to the source(s) of excessive emissions.[6]
Union Tank Car Company contends that there is an ambiguity in these regulations which poses constitutional problems. We agree.
The constitutional requirement of definiteness derives from the due process clauses of the United States and Louisiana Constitutions, and from Article I, § 13 and 16 of the 1974 Louisiana Constitution. Under these provisions, in order to pass constitutional muster, a criminal statute must meet two requirements. First, it must give adequate notice to individuals that certain contemplated conduct is proscribed and punishable by law. Secondly, it must provide adequate standards for those charged with determining the guilt or innocence of an accused. State v. Dousay, 378 So.2d 414 (La.1979).
In connection with the requirement of adequate notice, this court has held *385 that a penal statute must describe unlawful conduct with sufficient particularity and clarity that ordinary men of reasonable intelligence are capable of discerning its meaning and conforming their conduct thereto. State v. Baron, 416 So.2d 537 (La. 1982); State v. Dousay, 378 So.2d 414 (La. 1979); State v. Payton, 361 So.2d 866 (La. 1978). Likewise, the requirement of adequate standards for ascertaining guilt mandates that a criminal statute mark boundaries "sufficiently distinct for judges and juries to administer the law in accordance with the legislative will." City of Baton Rouge v. Norman, 290 So.2d 865, 868 (La. 1974). As explained by this court in the case of State v. Dousay, 378 So.2d 414, 417 (La.1979):
The constitutional requirement of definiteness is satisfied when the language of a criminal enactment `has a generally accepted meaning such that a person of ordinary intelligence would be given fair notice of what conduct is forbidden', State v. Defrances, 351 So.2d 133, 135 (La.1977), or when `the crucial words [or] phrases in the criminal statute have a fixed and definite meaning for the person of ordinary intelligence.' State v. Cloud, 248 La. 125, 130, 176 So.2d 620, 622 (1965). When, as here, administrative regulations are accompanied by criminal sanctions, the United States Supreme Court has stated that `businessmen must not be left to guess the meaning of regulations.' United States v. Mersky, 361 U.S. 431, 441, 80 S.Ct. 459, 465, 4 L.Ed.2d 423, 431 (1960).
The criminal code itself requires that penal statutes must be strictly construed and cannot be extended to cases not included within the clear import of their language, and that nothing is a crime which is not clearly and unmistakably made a crime. La.R.S. 14:3, 14:7, State v. Truby, 211 La. 178, 29 So.2d 758 (La.1947). The rules of strict construction applicable to the interpretation of penal statutes are also required in the interpretation of penal regulations. United States v. Mersky, 361 U.S. 431, 80 S.Ct. 459, 4 L.Ed.2d 423 (1960); State v. Dousay, 378 So.2d 414 (La.1979).
The specific provisions which are challenged by Union Tank Car Company as being unconstitutionally vague are LAC 14-11:4.74, the regulation defining "undesirable levels" of air contaminants, and LAC 14-11:17.11, the regulation requiring notification of emergency emissions. Our review of these provisions leads us to conclude that the challenged regulations fail to inform those to whom they are addressed of a proscribed standard of conduct so that men of common intelligence must necessarily guess at their meaning and differ as to their application.
In LAC 14-11:4.74, the words which are critical to a determination of vagueness are "appreciably injure," "beyond inconvenience," "materially injure or interfere," and "reasonable use." In LAC 14-11:17.11, the words challenged as vague are "substantially increase." These terms are no more definite in their context than the words "usual," "reasonable," and "proper" struck down by this court as vague in State v. Dousay, 378 So.2d 414 (La.1979). Likewise, they provide no more definite standards by which criminal conduct might be judged than the words "any immoral sexual purpose" found to be unconstitutionally vague in State v. Defrances, 351 So.2d 133 (La. 1977). The challenged words are in fact analogous to the following terms adjudged to be vague by the United States Supreme Court because they have no commonly accepted or recognized meaning: "real value", Collins v. Kentucky, 234 U.S. 634, 34 S.Ct. 924, 58 L.Ed. 1510 (1934); "unjust or unreasonable rate," United States v. L. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516 (1921); and "current rate of wages," Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926).
The vagueness of LAC 14-11:4.74 and 17.11 becomes particularly evident when one considers the following.
LAC 14-11:4.74 is the administrative definition of "undesirable levels" of air contaminants and the focus of the prohibitions in LAC 14-11:8.2 and 17.10. The definition *386 is substantially similar to that adopted by the legislature at La.R.S. 30:1083(2). LAC 14-11:4.74 defines "undesirable levels" as the presence in the atmosphere of air contaminants in such quantities and of such duration as to "appreciably injure human life beyond inconvenience" or "materially injure or interfere with the reasonable use of animal or plant life or property." Although such a definition provides sufficient direction to the administrative body to support the initial delegation of authority, when applied as the penal regulation itself, its language raises immediate questions. What constitutes injury beyond inconvenience? Is an odor or other emission "inconvenient" when it offends some but not all people? Must there be a provable and ascertainable injury or is it sufficient only to prove that the injury is more than inconvenient to any one person? At what point does an injury go beyond inconvenience? Health authorities tell us that cigarette smoking injures human life. Certainly this injury is more than inconvenient to many people. Is cigarette smoking an offense under the regulation?
People are affected differently by different smells. To some, one kind of smell will seem intolerable, while to others that same smell may not even be objectionable. Obviously, the meaning and import of LAC 14-11:4.74 will differ from person to person, place to place, and time to time.
The ambiguity inherent in this definition of "undesirable levels" is compounded by the fact that the criminal enforcement of the regulation requires the application of a quantitative standard to determine culpability. LAC 14-11:4.74 will be violated only when a certain quantity of a particular contaminant produces the effect proscribed in the regulation. Yet what standards of measurement are to be used to determine how much smell is prohibited? LAC 14-11:4.74 simply provides: "In determining whether contaminants create undesirable levels the Department may use appropriate information and data which may include but not be limited by acceptable national standards, published `safe limit' values and other such information and relationships which may provide a reasonable assessment of the conditions which exist for a particular situation." What are "acceptable national standards, published `safe limit' values and other such information"? Acceptable to whom? Published by whom? Obviously, the regulation fails to set specific limits for emissions so that a defendant will know in advance what conduct is proscribed. Instead the regulation is worded in such a way that its violation amounts to a mere conclusion on the part of the judge or jury without any facts upon which that conclusion might be justified. The regulation permits a court to decide arbitrarily the quantum of odor required to visit conviction and to impose a criminal penalty on a defendant.
The requirement in LAC 14-11:17.11 that prompt notice be given of emergency occurrences that will "substantially increase emissions" is likewise vague and uncertain. Does the term "substantially increase" include those instances in which an emergency occurrence results in a doubling of a particular emission from a source, although the amount emitted remains within the source's permitted levels? Or is it necessary that the source's permitted emission level be violated? Is it necessary that the "substantial increase" result in an "undesirable level"? No definition or explanation is provided.
In short, it is evident that the regulations of the Louisiana Air Control Law which Union Tank Car Company is charged with violating are unconstitutionally vague. Those regulations fail to afford a defendant adequate prior notice of what conduct is prohibited and also fail to provide adequate standards by which a judge or jury may determine guilt or innocence.
While other regulations do provide very detailed and specific emission limitations for various other types of air pollutants,[7] as well as providing substantial comprehensible *387 regulations with regard to the emission technologies to be utilized, LAC 14-11:4.74 and 17.11 are generally worded and not subject to definitely ascertainable measurement. Environmental legislation is not exempt from the due process requirement of definiteness, especially where serious criminal sanctions are involved.
Therefore, we hold that while the standards set forth in the Air Control Law are sufficient to effectuate a constitutional delegation of authority, the regulations Union Tank Car Company is charged with violating, LAC 14-11:17.11, 17.10, 8.2, and by reference, 4.74, fail to adequately inform potential defendants of what conduct is prohibited by law. Accordingly, we affirm the trial court's finding that the regulations cited in the indictment are unconstitutionally vague and affirm the judgment quashing the indictment.

DECREE
For the reasons assigned, the ruling of the trial court quashing the indictment against Union Tank Car Company is hereby affirmed.
AFFIRMED.
DIXON, C.J., concurs with reasons.
WATSON, J., concurs in the result.
DIXON, Chief Justice (concurring).
I respectfully concur in the result, but would hold the entire scheme an unconstitutional delegation of legislative authority, violative of Article II, Section 2 of the Louisiana Constitution.
The majority recognizes the rule that the legislature may delegate enough law-making power to administrative bodies to "fill up the details" with rules and regulations, and then abandons the requirement that the legislature must, indeed, establish standards within which the administrative body is to function as the lawgiver.
Instead of finding standards within the statutory authorization to make law, the majority finds a "policy" (pure air is a vital concern) then a "goal" (to promote a pollution-free environment) which is a "reasonable governmental policy."
"Policies" are not "standards."
No standards are noted in the statute.
The full legislative power to rule and regulate the pollution of the environment, consistent with industrial development, is abdicated in favor of an administrative agency, which now writes the laws designed to tell us what are environmental crimes.
Our Constitution differs from the federal Constitution, and is designed to free this state from the morass of administrative regulation which makes it more and more difficult for business and industry to know when it is athwart of the law.
NOTES
[1] The indictment actually charges Union Tank Car Company with violation of La.R.S. 30:1073(F) of the Louisiana Environmental Affairs Act. This is the wrong statute, as La.R.S. 30:1073(F) is merely a penalty section establishing the sanctions for violation of the substantive provisions of that act. It appears that the State intended to charge Union Tank Car with violation of the provisions of the Louisiana Air Control Law, La.R.S. 30:1081-1088. Union Tank Car Company notes this fact in brief, but dismisses it as being of no consequence to the resolution of the present issues. Accordingly, we will treat this case as if Union Tank Car is properly charged with violating the substantive provisions of the Louisiana Air Control Law, La.R.S. 30:1085 and 1087.
[2] For examples of cases in which the delegation of legislative authority to administrative boards has been upheld see Johnson v. Pearce, 313 So.2d 812 (La.1975); City of Lake Charles v. Wallace, 247 La. 285, 170 So.2d 654 (La.1965); Baton Rouge Waterworks Co. v. Louisiana Public Service Commission, 156 La. 539, 100 So. 710 (La.1924).
[3] La.R.S. 30:1054(12) provides:

"Discharge" means the placing, releasing, spilling, percolating, draining, pumping, leaking, seeping, emitting or other escaping of pollutants into the air, waters, subsurface water or the ground as the result of a prior act or omission; or the placing of pollutants into pits or drums, barrels or similar containers under conditions and circumstances that leaking, seeping, draining or escaping of the pollutants can be reasonably anticipated.
[4] La.R.S. 30:1083(1) states:

"Air contaminant" means particulate matter, dust, fumes, gas, mist, smoke, or vapor, or any combination thereof produced by other than natural processes.
[5] The present case is clearly distinguishable from the situation presented to this court in State v. Rodriguez, 379 So.2d 1084 (La.1980). In Rodriguez, the Secretary of the Department of Health and Human Resources was mandated by statute to add a drug to its list of controlled dangerous substances whenever the federal Drug Enforcement Administration classified that drug as a controlled dangerous substance. No independent evaluation of the drug was to be conducted on the state level. Consequently the statute at issue contained no standards for testing the characteristics of the drugs to be outlawed. That scheme was struck down by this court as constituting an unconstitutional delegation of legislative authority to the federal Drug Enforcement Administration.

Such a scheme is radically different from that set up in the Louisiana Air Control Law. The statutes of the Air Control Law clearly set forth the powers and procedures under which the ECC is to effectuate the legislative policy and provide guidance as to what the regulations promulgated by the ECC are to achieve. Thus, there is no unconstitutional delegation of legislative authority.
[6] The other regulations cited in the indictment, LAC 14-11:4.4 and 4.23, are definitional and not integral to the resolution of the present issues. They provide as follows:

4.4 Air Contaminants. Particulate matter, dust, fumes, gas, mist, smoke, or vapor, or any combination thereof produced by process other than natural.
4.23 Emission. A release of air contaminants into the outdoor atmosphere.
[7] For example, LAC 14-11:18.2 prohibits the emission of smoke exceeding the density specifications of No. 1 on the Ringelmann Smoke Chart. There is no evidence that a similar specificity cannot be achieved with regard to levels of odor emissions.